656 So.2d 1168 (1995)
Mack Arthur KING,
v.
STATE of Mississippi.
No. 94-DP-00216-SCT.
Supreme Court of Mississippi.
June 1, 1995.
*1170 James W. Craig, Jackson, James E. Rocap, III, Stephen L. Braga, Scott L. Nelson, David S. Cohen, David R. Fontaine, Miller Cassidy Firm, Washington, DC, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, MS, William S. Boyd, III, Bryant Clark Dukes Firm, Gulfport, MS, for appellee.
En Banc.
BANKS, Justice, for the court:
This is a post-conviction relief proceeding involving the imposition of the death penalty and, inter alia, what has come to be known as the Clemons issue. Application of our post-Clemons jurisprudence dictates that we remand this case to the trial court for another sentencing hearing. That disposition effectively resolves all other issues raised having any possible merit.

I.
King was found guilty of capital murder and sentenced to death on December 5, 1980. He appealed. This Court affirmed his conviction and sentence. King filed a petition *1171 for rehearing. This Court rejected King's request.
King then filed a petition for habeas corpus in the United States District Court for the Northern District of Mississippi, which denied relief. He appealed to the Fifth Circuit Court of Appeals. The Fifth Circuit reversed. It held that the "especially heinous, atrocious or cruel" aggravating circumstance jury instruction presented to the jury in King's trial without a limiting instruction was unconstitutional. The case was remanded to the district court with directions to issue the writ of habeas corpus unless the State of Mississippi initiates the appropriate proceedings.
In response, the State has called upon this Court to reweigh the aggravators or apply the harmless error analysis in reviewing King's sentence. King, however, urges this Court to remand his case to the trial court for a new sentencing hearing. In addition to the error concerning the "especially heinous, atrocious or cruel" aggravating circumstance, King raises three errors for review:
I. THE STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE CONCERNING MACK ARTHUR KING'S PSYCHIATRIC EXAMINATION VIOLATED HIS RIGHT TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.
A. THE STATE'S FAILURE TO DISCLOSE INFORMATION ABOUT MR. KING'S MENTAL CONDITION AND MEDICATION VIOLATED HIS RIGHT TO DUE PROCESS.
1. THE MISLEADING INFORMATION AND THE WITHHELD EXCULPATORY EVIDENCE ADVERSELY AFFECTED THE TRIAL PREPARATION.
2. THE MISLEADING EVIDENCE AND THE WITHHOLDING EXCULPATORY EVIDENCE DEPRIVED MR. KING AND THE JURY OF CRITICAL EVIDENCE DURING THE SENTENCING PHASE OF THE TRIAL.
B. THE STATE'S FAILURE TO DISCLOSE VITAL INFORMATION IN THE PSYCHIATRIC REPORT DEPRIVED MR. KING OF THE EFFECTIVE ASSISTANCE OF COUNSEL.
II. MACK ARTHUR KING WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS WELL AS HIS RIGHT UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WHEN THE STATE PSYCHIATRISTS ORDERED TO EVALUATE HIM BEFORE TRIAL FAILED TO CONDUCT AN ADEQUATE EVALUATION OF HIS MENTAL STATE AND FAILED TO MAKE AN ADEQUATE REPORT TO THE COURT AND TO DEFENSE COUNSEL.
III. RACIAL DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREMEN DEPRIVED MR. KING OF HIS RIGHT TO EQUAL PROTECTION.

II.
For a comprehensive treatment of the underlying facts of the offense and the subsequent history, the reader is directed to the reported decisions of this court on direct appeal, King v. State, 421 So.2d 1009 (Miss. 1982) and his prior application for post-conviction relief. King v. State, 503 So.2d 271 (Miss. 1987).
Before reaching the merits of this case, this Court must determine whether the claims raised by King are properly before this Court. Miss. Code Ann. § 99-39-21 provides:
(1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the State of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and *1172 actual prejudice grant relief from the waiver.
(2) The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this chapter upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.
(3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.
(4) The term "cause" as used in this section shall be defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.
(5) The term "actual prejudice" as used in this section shall be defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.
(6) The burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.
Additionally, Miss. Code Ann. § 99-39-27(9) provides:
The dismissal or denial of an application under this section is a final judgment and shall be a bar to a second or successive application under this chapter. Excepted from this prohibition is an application filed pursuant to section 99-19-57(2), Mississippi Code of 1972, raising the issue of the convict's supervening insanity prior to the execution of a sentence of death. A dismissal or denial of an application relating to insanity under section 99-19-57(2), Mississippi Code of 1972, shall be res judicata on the issue and shall likewise bar any second or successive applications on the issue. Likewise excepted from this prohibition are those cases in which the prisoner can demonstrate either that there has been an intervening decision of the Supreme Court of either the state of Mississippi or the United States which would have actually adversely affected the outcome of his conviction or sentence or that he has evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the conviction or sentence. Likewise exempted are those cases in which the prisoner claims that his sentence has expired or his probation, parole or conditional release has been unlawfully revoked.
As the State argues, all of the claims raised by King, except for the "especially heinous, atrocious, or cruel" aggravating circumstance issue are barred by the above statutes. After King's second application for leave to petition the circuit court for writ of error coram nobis, this Court ordered an evidentiary hearing for the purpose of determining whether King was denied effective assistance of counsel at the sentencing phase of his trial. The circuit court found that King was afforded effective assistance of counsel at the sentencing phase of his trial. King v. State, 503 So.2d 271, 273 (Miss. 1987). On appeal King argued that his counsel's failure to investigate and prepare a defense for the sentencing phase of trial deprived him of his constitutional right to counsel. This Court affirmed holding that King failed to establish that his counsel's performance was deficient. Id. at 274.
Now, King argues that the State deprived him of due process and effective assistance of counsel by failing to disclose information regarding his level of intelligence and need for medication. King is procedurally barred from raising this issue because the issue has already been litigated on a different theory.
For the first time, King has raised the issue that the psychiatrist ordered to examine him failed to conduct an adequate evaluation of his mental state, and that counsel failed to make an adequate report to the court and defense counsel, and that racial discrimination in the selection of grand jury foremen deprived him of his right to equal protection. Having failed to raise these issues *1173 at trial or on direct appeal, King is deemed to have waived them, and is procedurally barred from raising them now.
We have consistently treated Clemons claims as exceptions to the procedural bar rule, under the intervening decision proviso of the statute. See Irving v. State, 618 So.2d 58 (Miss. 1992); Gilliard v. State, 614 So.2d 370 (Miss. 1992); Pinkney v. State, 602 So.2d 1177 (Miss. 1992); Jones v. State, 602 So.2d 1170 (Miss. 1992); Shell v. State, 595 So.2d 1323 (Miss. 1992); and Clemons v. State, 593 So.2d 1004 (Miss. 1992).

III.
Although the State is well aware of this Court's holdings that it will not reweigh aggravating and mitigating circumstances, it nonetheless urges this Court to engage in such a task. In Wilcher v. State, 635 So.2d 789 (Miss. 1993), this Court pointed out that it has repeatedly refused to reweigh aggravators and engage in harmless error analysis on the issue of the "especially heinous, atrocious or cruel" jury instruction.
In Wilcher, we refused to reweigh the aggravators against the mitigators, holding that § 99-19-101 militated such a result. This Court pointed to its decision in Clemons II, 593 So.2d 1004 (Miss. 1992). In that case, this Court held that under Miss. Code Ann. § 99-19-101 (Supp. 1991), "finding aggravating and mitigating circumstances, weighing them, and ultimately imposing a death sentence are, by statute, left to a properly instructed jury."
This Court also clarified its basis for refusing to apply harmless error analysis stating, "[it] cannot logically, either as a matter of state or federal law, distinguish how we can perform harmless error analysis without reweighing. A court reviewing a death sentence in which the weighing process has been skewed may not simply apply a limiting construction to the factor that has skewed the weighing, but must also reconsider the entire mix of aggravating and mitigating circumstances presented to the jury."
This is particularly so in view of the Mississippi Constitution, the Wilcher Court stated.
"Article 3, § 26 affords criminal defendants in this state the right to trial by jury, while Art. 3, § 14 affords the right to due process of law. Although criminal defendants in this State generally have no right to be sentenced by a jury, where a specific statute provides such a guarantee, such as § 99-19-101 (Supp. 1992), these two constitutional provisions operate together to elevate the statutory right to one of constitutional significance which this Court cannot abridge by applying harmless error analysis, whether by disregarding entirely the invalid circumstance or by applying a limiting construction."
635 So.2d at 791.
The state, by supplemental brief in response to the motion to vacate sentence, suggests that the 1994 amendments to our sentencing statute giving this Court authority to reweigh or apply harmless error analysis should be given effect here. Miss Code Ann. § 99-19-105 (1972 and Supp. 1994) We reject the contention.
First, we have already implicitly rejected application of the amended statute to others similarly situated on two occasions. Dufour v. State, No. 03-DP-0041 (Miss. Oct. 20, 1994); Smith v. State, No. 93-DP-670 (Miss. Dec. 21, 1994). Consistency in the application of the death penalty dictates that we follow that course here. Additionally, the right to a jury determination of the penalty of death is a substantial substantive right long held in this state.[1] The elimination of such rights is not ordinarily given retroactive effect, especially in cases such as the instant one where there is no explicit legislative direction to do so. State ex rel. Moore v. Molpus, 578 So.2d 624, 642 (Miss. 1991). Finally, and in that same vein, there is the statutory command that "laws ... for the *1174 imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them ... notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes." Miss. Code Ann. § 99-19-1 (1972); Allen v. State, 440 So.2d 544 (Miss. 1983).

THE STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE CONCERNING MACK ARTHUR KING'S PSYCHIATRIC EXAMINATION VIOLATED HIS RIGHT TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.
King contends that the court-appointed psychiatrists' failure to disclose their opinions regarding his need for medication for headaches and dizziness, as well as his low level of intelligence, violated the rule set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). While we conclude that this issue is procedurally barred, we discuss it on the merits for future guidance.
In Brady, the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S.Ct. at 1196. The prosecutor in Brady failed to disclose a statement to the defendant that his co-conspirator admitted that he (the co-conspirator) killed the victim. The defendant did not learn of the statement until he had been tried, convicted and sentenced and his sentence affirmed.
United States v. Spagnoulo sets forth a four-prong test to determine whether a Brady violation has occurred mandating a new trial. To establish a Brady violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. Spagnoulo, 960 F.2d 990, 994 (11th Cir.1992), citing United States v. Meros, 866 F.2d 1304, 1308 (11th Cir.1989), (cert. denied), 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989).
Before reaching the question of whether the information was exculpatory, this Court must determine whether the psychiatrists were members of the prosecutorial team, and, as such, had a duty under Brady to disclose exculpatory evidence. This Court has never addressed that question. However, under our case law, persons other than prosecuting attorneys have been found to be members of the prosecutorial team for Brady and discovery purposes.
This Court pointed this out in a footnote in Box v. State, 437 So.2d 19, 25-26 (1983).
"Another familiar excuse is that the police had the information but the prosecuting attorneys were not aware of it. This will not do. When police officers have been in possession of discoverable information for nine months, the State is entitled to no consideration because the district attorney or his assistant did not look at the file until the night before trial. The State, in the present context, is a team consisting of the attorney, the law enforcement officers of the jurisdiction in which the case is brought, all other cooperating law enforcement officials  municipal, county, state or federal, the prosecution witnesses, and any other persons cooperating in the investigation and prosecution of the case. What is known or available to any one or more is deemed to be known by or available to the State. All are collectively "the State" for present purposes. See United States v. Deutsch, 475 F.2d 55, 57 (5th Cir.1973). When responding to requested or ordered discovery under Rule 4.06, the State, as here collectively defined, should disclose all information it could obtain with due diligence or upon reasonable inquiry. And, discovery responses should be supplemented when, as trial approaches if, (a) the information previously furnished appears *1175 incomplete, misleading or downright incorrect or (b) the State comes into possession of new information within the scope of the discovery request as allowed." Gallion v. State, 396 So.2d 621, 622, 624 (Miss. 1981). (emphasis added).
King cites several cases to support his contention that psychiatrists, and other persons, are recognized as state actors for constitutional purposes. King relies on Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), United States v. Deutsch, 475 F.2d 55 (5th Cir.1973), and Blake v. Kemp, 758 F.2d 523 (11th Cir.1985). King argues that because the psychiatrists, as state actors, were in possession of information concerning his level of intelligence and need for medication, the State is deemed to have been aware of such information and should have disclosed the information to him. The State's failure to apprise him of the existence of the psychiatrists' findings violated Brady, King argues.
King is correct in stating that Smith stands for the proposition that a psychiatrist may be recognized as a state actor for some constitutional purposes. However, King fails to realize that psychiatrists are not members of the prosecutorial team merely because they conduct an examination to determine a defendant's competency to stand trial.
In Smith, the Court noted that the psychiatrist went beyond merely reporting his findings regarding Smith's competency to the court. The psychiatrist was called at the sentencing phase of the trial and he testified (a) that Smith "is a very severe sociopath"; (b) that "he will continue his previous behavior"; (c) that his sociopathic condition will "only get worse"; (d) that he has no "regard for another human being's property or for their life, regardless of who it may be"; (e) that "[t]here is no treatment, no medicine ... that in any way at all modifies or changes this behavior"; (f) that he "is going to go ahead and commit other similar or same criminal acts if given the opportunity to do so"; and (g) that he "has no remorse or sorrow for what he has done." Smith, 451 U.S. at 459, 101 S.Ct. at 1871, 68 L.Ed.2d at 367.
Outside of the presence of the jury, Dr. Grigson stated: "(a) that he had not obtained permission from Smith's attorneys to examine him; (b) that he had discussed his conclusions and diagnosis with the State's attorney; and (c) that the prosecutor had requested him to testify and had told him, approximately five days before the sentencing hearing began, that his testimony probably would be needed within the week." Id.
The Smith Court stated that it was Dr. Grigson's testimony at the penalty phase that changed his role and he "became essentially like that of an agent of the State recounting unwarned statements made in a post arrest custodial setting." Smith, 451 U.S. at 467, 101 S.Ct. at 1875, 68 L.Ed.2d at 372.
The instant case is distinguishable from Smith. The most critical difference is the level of participation of the psychiatrists in the instant case was limited to examining King and reporting their findings to the court. Unlike the psychiatrist in Smith, the psychiatrists who examined King did not testify against him during the penalty phase of his trial. In fact, they were not called at trial. As stated above, the Smith Court recognized the psychiatrist in that case as a member of the prosecutorial team, not because he examined Smith to determine his competency to stand trial, but because he testified for the prosecution at the penalty phase regarding Smith's future dangerousness. Since the psychiatrists in the case at bar merely reported to the court that King was competent to stand trial, Smith does not mandate that this Court recognize them as state actors for constitutional purposes.
King also cites Deutsch. In that case, the Fifth Circuit remanded the case to the trial court for a determination of whether a personnel file could have been used for impeachment purposes. In Deutsch, the defendants were convicted of offering to pay a postal employee $50 for each credit card that the postal worker intercepted in the mail and giving a postal employee money to induce him to act in violation of his lawful duty. The defendants appealed.
The government's whole case rested on the testimony of the postal employee. The defendants sought the production of the postal *1176 employee's personnel file for "insight into the character of said prospective witness." The U.S. Attorney responded, "This office does not have the personnel file of D.F. Morrison." The court ruled "[T]he prosecutors cannot be compelled to disclose something which it does not have. Furthermore, the Post Office Department does not appear to be an arm of the prosecution as contemplated by Brady."
At trial, the postal employee claimed the defendants gave him money to purchase credit cards. One of the defendants testified that he gave the postal employee a loan to help care for his sick wife.
On appeal, the Fifth Circuit stated that the defendants should have been given an opportunity to attack the postal employee's credibility. In reversing, the Fifth Circuit stated:
We find no reference in Brady to an arm of the prosecution. It was a Post Office employee who had been sought to be bribed. The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny having access to the Post Office files. In fact it did not deny access, but only present possession without an attempt to remedy the deficiency ... . . We do not suggest that the government was obliged to obtain evidence from third parties, but there is no suggestion in Brady that different "arms" of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities.
Deutsch, 475 F.2d at 57.
The instant case is distinguishable from Deutsch. Unlike the government's case in Deutsch, the State's case did not rest on the information obtained by the psychiatrists who examined King. Additionally, the psychiatrists were not principal witnesses in King's case. In fact, they were not called as witnesses against King. Moreover, the close connection that existed in Deutsch between the Post Office and the Department of Justice did not exist in the instant case.
Of greater significance is the fact that Deutsch does not stand for the proposition that a prosecutor is deemed to possess information in the hands of a state or federal agency, merely because they are governmental agencies. Rather a prosecutor is deemed to possess information in the hands of all members of the prosecutorial team, both investigative and prosecutorial personnel. The former Fifth Circuit in United States v. Antone, in refusing to draw a distinction between different agencies under the name government, stated that the focus should be on the "prosecution team which includes both investigative and prosecutorial personnel." 603 F.2d 566, 569 (5th Cir.1979).
Following the Fifth Circuit's lead, the court in Meros stated, "the requirement that the government possess the evidence can be satisfied if the evidence was in the possession of the prosecutor or anyone over whom the prosecutor had authority." 866 F.2d at 1309.
In the instant case, the prosecutor had no control over the psychiatrists. In fact, the mental examination conducted by the psychiatrists was not done at the behest of the prosecutor. It was the trial court that commanded the psychiatrists to conduct the examination after a request by King's counsel. This Court holds that the psychiatrists were not members of the prosecutorial team for Brady purposes. Consequently, King fails part I of the Spagnoulo test.
He also fails the other parts of the test as well. As discussed in greater detail below, the information in the psychiatrists' report, though useful as to King's punishment, was not favorable to him on the issue of guilt. Additionally, with reasonable diligence King could have obtained the information. More importantly, King did not demonstrate that a different result would have been reached had the information been disclosed. Thus, King's Brady contention must fall.
King relies on Blake v. Kemp for the proposition that a trial judge's order for a psychiatric examination places a duty upon the prosecution to release all evidence relating to the defendant's mental state to both the defense and the examining psychiatrist despite the absence of a defense request for such information. Thus, King argues that the *1177 State was obligated to disclose not only information bearing on his intelligence, but on his need for medication as well.
In Blake, the defendant killed his girlfriend's daughter by dropping the child off a bridge. Within six or seven hours after the baby's death, Blake gave a full taped confession to the investigating officer after adequate warnings had been given. "All I know is I did wrong and in another way I did right. At least the baby don't have to suffer about it because the mama and/or the real father ain't fit to have a child like that. The baby is too good for any one of us. She is in a better place now." Blake, 758 F.2d at 527.
Blake also wrote the following note, which was delivered to the jailer:
To Whom That Every Read This Letter, I have done the right thing by turning myself in, but I have a promise to keep my little girl Tiffany. I told her that I would join her soon. But now the time has come too for me to go to her. She came to me and said she wanted me now. So I must go because I promised Tiffany and I love her. That we'll be together on the other side. So you see and understand that I never lost her cause she is wait (sic) for me. I'm just sorry that Jackie won't be there with us. Me and Tiffany will live in peace now forever. I will go to her now. May god forgive me for all my sins. Joseph James Blake.
Id.
Two weeks after Blake wrote the note, the trial court ordered a psychiatric examination for him. The State failed to disclose the taped confession and note to the examining psychiatrist and Blake's attorney. The psychiatrist found that Blake was competent to stand trial. The psychiatrist, however, was unable to reach a conclusion regarding Blake's sanity because Blake lacked memory about the particular incident.
The Blake Court held that "the statements at least raise sufficient question as to Blake's sanity that they should have been presented to the psychiatrist early enough to allow adequate consideration of them in preparation of his evaluation." Id. at 530.
King's reliance on Blake is ill-founded. The most critical distinction between Blake and the instant case is in Blake the defendant's confession was in the possession of the prosecutor. That is, the confession was given to law enforcement officials. It is elemental that law enforcement officials involved in the investigation of a crime are members of the prosecutorial team.

IV.
King argues that evidence of his level of intelligence and medical needs were material to his guilt and punishment trials. He cites United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Under Bagley evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682, 105 S.Ct. at 3383.
King argues that "by withholding this information, the State prevented King's attorney from preparing an adequate defense at his trial." However, he failed to demonstrate that a different result would have been reached had the information been disclosed and presented to the jury. King failed to carry the burden of showing materiality of the information, as it pertains to his guilt. Moreover, we have concluded that the evidence was available to him and his failure to have it is not chargeable to the prosecution.
King argues that the information was material to his punishment. Here, it is clear that information concerning his level of intelligence and his need for medication was relevant to his punishment. That is, the information could have been used in mitigation, allowing the jury to return a lesser sentence. King argues that by withholding their opinions as to his level of intelligence, the psychiatrists deprived him of "a critical piece of mitigating evidence which the jury would have been required to consider." He relies on Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In Penry, the U.S. Supreme Court held that a low level of mental functioning ability is a mitigating circumstance *1178 of which the jury must be instructed to consider.
This case is being remanded for a new sentencing hearing. King now has the information in question. It follows that the question of the effect of the lack of this information on the punishment phase is mooted by our disposition of the Clemons issue.

V.
King argues that "when the actions on the part of the State rise to the level of interfering with a defendant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution, the defendant is entitled to a new trial." He cites United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984); Blake, supra; and Geders v. United States, 425 U.S. 80, 91, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976) to support that proposition.
In Cronic, the respondent and two of his associates were indicted on mail fraud charges involving the transfer of over $9,400,000 in checks between banks in Tampa, Florida, and Norman, Oklahoma during a 4-month period in 1975. Respondent was found guilty. He filed a motion in Federal District Court to vacate his conviction on the ground of ineffective assistance of counsel. The District Court refused to hear the motion while Cronic's appeal was pending. The Court of Appeals allowed Cronic's motion to supplement the record with material critical of trial counsel's performance.
Utilizing an inferential approach, the Court of Appeals found that Cronic's counsel was ineffective. The Court of Appeals vacated Cronic's conviction after finding that his constitutional right to the effective assistance of counsel had been violated. That inference was based on its use of five criteria: "`[T]he time afforded for investigation and preparation; (2) the experience of counsel (3) the gravity of the charge (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel.'" 466 U.S. at 648, 104 S.Ct. at 2041, 80 L.ED.2d at 661.
The U.S. Supreme Court held that the Court of Appeals erred in utilizing an inferential approach in that case. The high court held that Cronic was not a case "in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." 466 U.S. at 649, 104 S.Ct. at 2041, 80 L.Ed.2d at 661. As such, the court pointed out that the only way Cronic could establish an ineffective assistance of counsel claim was to point to specific errors made by trial counsel. The Supreme Court stated the Court of Appeals could consider Cronic's claim that the record supported an attack based on specific errors on remand.
King's reliance on Cronic and the other cases is ill-founded. Unlike those cases, there is no evidence that the prosecutor had anything to do with the psychiatrists' failure to disclose information concerning King's need for medication or his low level of intelligence. As stated above, the psychiatrists were not under the control of the prosecutor. Since the psychiatrists were not members of the prosecutorial team, King's argument that the State interfered with his right to counsel and that such interference made it unlikely that he could have received effective assistance of counsel must fall.
King argues that the psychiatrists' failure to disclose so interfered with his right to counsel that he is entitled to a new trial. King is correct in stating that the psychiatrists failed to comply with the court order. The order for mental examination issued by the trial court commanded the psychiatrists to determine:
A. The level of intelligence of the Defendant,
B. The Defendant's ability to comprehend the gravity of the charges against him,
C. The Defendant's ability to help in preparation of his defense and to understand the same,
D. The standard of conduct that would be expected of the defendant in certain factual situations to be developed during the trial; and
E. The competency of the Defendant to stand trial.
*1179 The question is whether the psychiatrists' failure to disclose their findings as to each issue deprived King of the effective assistance of counsel. In King this Court held that King's counsel was not ineffective even though counsel did not investigate King's intellectual capacity. 503 So.2d at 275. If we accept that premise, and we must because it is not only the law of the case, but res judicata under our post-conviction relief scheme, it follows that the psychiatrists' failure to disclose information regarding King's need for medication and level of intelligence did not render King's counsel ineffective. Miss. Code Ann. § 99-39-23(6) (1972).

VI.
King argues that the State's failure to disclose its impressions of his level of intelligence as well as his medical conditions violated his rights under Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1984). The issue in Ake was whether the Constitution requires that an indigent defendant have access to a psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition.
The U.S. Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096.
The Court further stated "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purposes we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right." As stated above, the psychiatrists did not disclose their findings on several issues that the court ordered them to inquire into. It does not follow the psychiatrists' examination was inadequate merely because they failed to report their findings to the court. Id.
Moreover, the time to question the psychiatrists' report was when it was given to the court. The psychiatrists' failure to disclose the requested information could easily have been cured if King's counsel had only sought additional relief from the court. King's counsel should have asked the psychiatrists how they reached the conclusion that his client was competent to stand trial. Defense counsel also could have asked the psychiatrists about King's level of intelligence. He neglected to do so. As such, this Court should not find that the psychiatrists' performance was inadequate, where the defense counsel had ample opportunity to seek further psychiatric assistance in the preparation of his client's defense.
King also cites Smith v. McCormick, 914 F.2d 1153 (9th Cir.1990). The defendant in that case argued that his sentencing violated due process because he was denied expert psychiatric assistance in preparing his claims of mitigating circumstances.
The defendant requested a court-appointed psychiatrist to help establish possible mitigating circumstances. The trial court agreed that psychiatric evaluation was appropriate. However, rather than appointing an expert to assist Smith in preparation for a resentencing hearing, the trial judge ordered an evaluation for the court, which would be reported directly to the court. The psychiatrist's contact with Smith was limited to the court-ordered examination.
The Ninth Circuit held that Smith was entitled to his own competent psychiatric expert. The court stated:
These limitations underscore the logical necessity of allowing the indigent's counsel to confer with the state-appointed psychiatrist before deciding whether, or how, to place the results of psychiatric evaluation before a fact-finder. If the only psychiatrist provided makes an evaluation which is damaging for a particular defense, an indigent, unlike a wealthy defendant, lacks the financial capacity to retain other psychiatrists. Competent counsel would want to refrain from introducing harmful testimony *1180 to the factfinder, but could still ask the court-appointed psychiatrist to consider other forms of defense. Counsel might restrict the use of the psychiatrist to assistance in refuting other evidence bearing on mental capacity; or might choose not to present testimony on certain forms of mental impairment at all. None of these options was available to Smith since the court gave explicit directions limiting the scope of his psychiatric evaluation, and since the report was forwarded directly to the court he was deprived of those options. We further note that since defense counsel cannot predict the outcome of a psychiatric evaluation, to grant court-appointed psychiatric assistance only on condition of automatic full disclosure to the fact finder impermissibly comprises presentation of an effective defense, by depriving him of "`an adequate opportunity to present [his] claims fairly within the adversary system. Competent psychiatric assistance in preparing the defense is a "basic tool" that must be provided to the defense. To impose such a condition as full disclosure takes away the efficacy of the tool.'"
914 F.2d at 1159
The instant case is distinguishable from McMormick. There is no evidence in this case that any limitations or restraints were placed on defense counsel's contact with the psychiatrists. A copy of the letter that the psychiatrists sent to the court concerning King was also given to King's attorney. Since the trial court did not place any limitations on King's contact with the psychiatrists, it cannot be said that he was deprived of the assistance of a competent psychiatrist.

VII.
King argues that because the grand jury foreman was selected in violation of the equal protection clause his conviction must be vacated. King cites Johnson v. Puckett, 929 F.2d 1067 (5th Cir.1991); Guice v. Fortenberry, 661 F.2d 496, 499 (5th Cir.1981) (en banc); and Rose v. Mitchell, 443 U.S. 545, 555-56, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979).
As the State points out, this issue could or should have been raised at trial or on direct appeal. Defense counsel failed to object at that time and has not demonstrated why he failed to object at trial or on direct appeal to the selection of grand jury foreman. Thus, his claim is procedurally barred.

CONCLUSION
For the foregoing reasons we remand this case to the trial court for a new sentencing hearing.
APPLICATION FOR LEAVE TO FILE MOTION TO VACATE CONVICTION AND DEATH SENTENCE IS GRANTED; MOTION TO VACATE CONVICTION AND DEATH SENTENCE GRANTED IN PART AND DENIED IN PART; MOTION TO CONDUCT REWEIGHING OR HARMLESS ERROR ANALYSIS IS DENIED; CASE REMANDED FOR A NEW SENTENCING HEARING.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN and PITTMAN, JJ., concur.
McRAE, J., concurs in result only.
DAN M. LEE, P.J., dissents with separate written opinion joined by SMITH, J.
SMITH, J., concurs in part and dissents in part with separate written opinion joined by ROBERTS, J.
DAN M. LEE, Presiding Justice, dissenting:
On August 3, 1980, Mrs. Lelia Patterson was found dead in a bathtub in her home. After an investigation, Mack Arthur King (hereinafter King) was arrested and charged with capital murder. Subsequently, King admitted that he had burglarized Patterson's home on the night of August 2, 1980, but denied killing her. Thereafter, King was tried, convicted and sentenced to death by a Lowndes County jury. At trial the evidence demonstrated that King manually strangled Patterson, struck her on the back of her head with such force so as to cause edema of the brain and then either held her under water or left her mortally injured and unconscious in her bathtub. Each of these injuries could have caused her death. King v. State, 421 So.2d 1009, 1011 (Miss. 1982). Today, once *1181 again, the majority turns a blind eye towards applying harmless error analysis in this case that involves the "especially atrocious, heinous or cruel aggravator." Because I find the majority's position legally untenable and unsupported by our death penalty law, I respectfully dissent.

I.
By now I am sure that most individuals in this State who are at all interested in the mechanics of our capital punishment laws are aware that the United States Supreme Court in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), stated that this Court, when confronted with the "especially atrocious, heinous or cruel" aggravator given without the proper limiting instruction, must elect from three options. The United States Supreme Court in Clemons said that this Court could: (1) reweigh the aggravating and mitigating circumstances; (2) apply harmless-error analysis; or (3) reverse the death sentence and remand the case back to the trial court for a new trial on the penalty phase. Id. We have always selected the third option.

A.
The majority opinion aptly points out that we as a Court have consistently stated that we will not reweigh aggravating and mitigating circumstances. King v. State, at 1173. I have consistently concurred with this statement. See Irving v. State, 618 So.2d 58, 63-64 (Miss. 1992), Wilcher v. State, 635 So.2d 789, 801 (Miss. 1993), and Wiley v. State, 635 So.2d 802, 805 (Miss. 1993). Under Miss. Code Ann. § 99-19-105 (Supp. 1993), this Court could not reweigh aggravating or mitigating circumstances.

B.
Nevertheless, it has been my consistent opinion that this Court can and should apply harmless-error analysis in cases such as this where the impermissibly vague "especially atrocious, heinous or cruel" aggravator was used. See Wilcher v. State, 635 So.2d 789 (Miss. 1993); Wiley v. State, 635 So.2d 802, 805 (Miss. 1993). The United States Supreme Court in Clemons quoted the following from Barclay v. Florida, 463 U.S. 939, 958, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983);
Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance... . `What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime.' Zant [v. Stephens], [462 U.S. 862], at 879 [103 S.Ct. 2733, at 2744, 77 L.Ed.2d 235] (emphasis in original).
Clemons, 494 U.S. at 752-753, 110 S.Ct. at 1450, 108 L.Ed.2d at 741.
Likewise, I see no reason why this Court, by applying harmless-error analysis and making an individualized determination, cannot decide that the elimination of an "improperly considered aggravating circumstance could not possibly affect the balance."
The basic test for harmless error in the federal constitutional realm goes back to Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Chapman test is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." The United States Supreme Court in Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432, 448 (1991), further clarified harmless-error analysis and held that the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether that error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates, 500 U.S. at 403, 111 S.Ct. at 1893, 114 L.Ed.2d at 449.
This Court's continued reliance upon our flawed rationale in Wilcher v. State, 635 So.2d 789 (Miss. 1993), to continually reject *1182 the State's request that we apply harmless error analysis, is legally indefensible. The majority continues to labor under the mistaken impression that if we apply harmless-error analysis, we will be sentencing King to death in derogation of Miss. Code Ann. § 99-19-101. This is clearly not the case. King came to this Court under a sentence of death and this sentence was imposed upon King by twelve good and true jurors from Lowndes County. To suggest that we would be sentencing King to death if we were to apply harmless-error analysis to the case sub judice requires a stretch of the judicial imagination I choose not to exercise.
Upon appellate review of a capital murder case, we cannot, under Miss. Code Ann. § 99-19-101 (1994), disagree with the jury's decision to sentence a person convicted of capital murder to life in prison, and instead, sentence the accused to death. Miss. Code Ann. § 99-19-101 (1994) clearly provides that only the jury can sentence the capital murderer to death unless of course the State of Mississippi and the defendant agree in writing to waive the jury determination of sentence and allow the trial court to determine the punishment. Therefore, I find puzzling the majority's attempt to equate our use of harmless-error analysis as a violation of King's statutory right[1] to be sentenced to death by a jury.

II.
In August 1994, the Legislature of the State of Mississippi addressed the problems raised by this Court with Miss. Code Ann. § 99-19-105 (Supp. 1993). The legislature amended Miss. Code Ann. § 99-19-105 to correct problems with the prior statute as pointed out by this Court. The amended § 99-19-105 provides in relevant part:
Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstances was harmless or both.
....
... The Court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
(a) Affirm the sentence of death;
(b) Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing; or
(c) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.
However, with this opinion, the majority chooses to ignore Miss. Code Ann. § 99-19-105 (Supp. 1994). The majority in the case sub judice relies on Dufour v. Hargett, No. 3:87cv74GR (S.D.Miss. Oct. 3, 1994), to support its decision not to apply Miss. Code Ann. § 99-19-105 (Supp. 1994) to King's appeal.
In its October 3, 1994 Memorandum Opinion and Order, the Federal District Court in Dufour, when faced with the question of whether this Court would apply the recently amended Miss. Code Ann. § 99-19-105 (Supp. 1994) to Dufour's appeal, opined in part:
The Court further finds that the retroactive application of Mississippi Code Annotated § 99-19-105, as amended, would impair DuFour's vested right to due process of law. The Mississippi Supreme Court has stated that Mississippi Code Annotated § 99-19-101 (Supp. 1992) confers such a right.
Article 3, § 26 [of the Mississippi Constitution] affords criminal defendants in this [S]tate the right to trial by jury, while Art. *1183 3, § 14 affords the right to due process of law. Although criminal defendants in this State generally have no right to be sentenced by the jury, where a specific statute provides such a guarantee, such as § 99-19-101 (Supp. 1992), these two constitutional provisions operate together to elevate the statutory right to one of constitutional significance which this Court cannot abridge by applying harmless error analysis, whether by disregarding entirely the invalid circumstances or by applying a limiting construction.

Wilcher, 635 So.2d at 791. Because his right to due process would be impaired, the amended version of Mississippi Code Annotated § 99-19-105 may not be applied by the Mississippi Supreme Court when it reviews the Motion to Conduct Reweighing or Harmless Error Review of Sentence which was filed by the State with regard to DuFour's unconstitutional death sentence. The Court therefore finds that the current motion pending before the Mississippi Supreme Court is inadequate to afford DuFour the appropriate relief to which he is entitled. Consistent with Wilcher, Wiley and other death penalty cases, the Court finds that the Mississippi Supreme Court would simply remand DuFour's case to the trial court for resentencing. To prevent any further delays, the Court will therefore fashion a remedy which is appropriate under the circumstances.

....
For the reasons set forth in this Memorandum Opinion and Order, the Court finds that the Motion for Entry of Writ of Habeas Corpus should be granted in part. The request that the petitioner be permanently discharged from the custody of the State of Mississippi will be held in abeyance for sixty (60) days from the date of entry hereof. It is therefore, ORDERED AND ADJUDGED that the Petition for Entry of Writ of Habeas Corpus is hereby granted in part, and the writ shall issue forthwith from the Clerk of this Court directing the petitioner's sentence to death to be vacated. It is further
ORDERED AND ADJUDGED that the State shall resentence the petitioner within sixty (days) of the entry of this order. If the State fails to resentence the petitioner within this time frame, the Court will issue a writ of habeas corpus permanently releasing the petitioner from the custody of the State of Mississippi.
DuFour v. Hargett, Civ. Action No. 3:87cv74GP, slip op. 8-9, 11-12 (Oct. 3, 1994). (emphasis added).
While we appreciate the difficult position that the federal district court is placed in when forced to make an "Erie guess," and while federal district court cases and Fifth Circuit decisions are certainly persuasive, it is this Court's province to decide matters of state law. Sperry-New Holland v. Prestage, 617 So.2d 248, 256 (Miss. 1993); Lockhart v. Fretwell, 506 U.S. ___, ___, 113 S.Ct. 838, 847, 122 L.Ed.2d 180, 193 (Thomas, J., concurring) (An Arkansas trial court is bound by decisions of the United States Supreme Court and decisions of superior Arkansas appellate courts, if it follows the Eighth Circuit's interpretation of federal law, it does so only because it chooses to). See also Irving v. State, 441 So.2d 846, 851 (Miss. 1983). Accordingly, the Supreme Court of the State of Mississippi and not the United States Federal District Court for the Southern District of Mississippi must decide if Miss. Code Ann. § 99-19-105 (Supp. 1994) as amended is violative of DuFour's right to due process or is violative of the Ex Post Facto clause of the United States Constitution.
First, we address the federal district court's determination that Wilcher v. State, 635 So.2d 789 (Miss. 1993), prevents the State of Mississippi from applying harmless error analysis in capital punishment cases. In Wilcher, this Court opined:
Article 3, § 26 affords criminal defendants in this state the right to trial by jury, while Art. 3, § 14 affords the right to due process of law. Although criminal defendants in this State generally have no right to be sentenced by the jury, where a specific statute provides such a guarantee, such as § 99-19-101 (Supp. 1992), these two constitutional provisions operate together to elevate the statutory right to one of constitutional significance which this Court cannot abridge by applying harmless error *1184 analysis, whether by disregarding entirely the invalid circumstances or by applying a limiting construction.
Wilcher, 635 So.2d at 791. (emphasis added).
In Wilcher, the majority stated that "these two constitutional provisions [Art. 3, § 14, Art. 3, § 26] operate together to elevate the statutory right [to be sentenced to death by jury] to one of constitutional significance which this Court cannot abridge ..." Id. While it may be that this Court cannot abridge this statutory right, the legislature certainly can. Bowen v. Williams, 238 Miss. 57, 117 So.2d 710 (1960). In Mississippi the legislature, not this Court, is responsible for promulgating laws that govern capital punishment. Johnston v. State, 618 So.2d 90, 95 (Miss. 1993); Johnson v. State, 477 So.2d 196 (Miss. 1985); Rogers v. State, 228 Miss. 873, 89 So.2d 860 (1956). In Presley v. Mississippi State Hwy. Com'n, 608 So.2d 1288 (Miss. 1992), we held that the legislature could not "encase and entomb" the common law in statutory law to keep the common law from being changed by the courts. Likewise, this Court cannot "encase and entomb" statutes in our case law to prevent them from being changed by the legislature. Any attempt by this Court to keep the legislature from amending death penalty statutes and enacting new death penalty legislation would constitute an encroachment by this Court upon the province of the legislature.
The legislature may overrule this Court's interpretation of statutory law by either amending the statute in question or by enacting a new statute to supplant a decision of this Court. Estate of Stamper, 607 So.2d 1141, 1148 (Miss. 1992) (Legislature amended Miss. Code Ann. § 81-5-63 to overrule our opinion in Matter of Estate of Holloway, 515 So.2d 1217 (Miss. 1987)). In Miss. Code Ann. § 99-19-105 (Supp. 1994) the legislature has, in fact, overruled our previous interpretations of Miss. Code Ann. § 99-19-105. Miss. Code Ann. § 99-19-105 (Supp 1994) provides that this Court shall engage in reweighing or harmless error analysis. A basic tenet of statutory construction is that "shall" is mandatory and "may" is discretionary. Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1027 (Miss. 1990); Murphy v. State, 253 Miss. 644, 178 So.2d 692 (1965). Therefore, under the amended Miss. Code Ann. § 99-19-105, we must, on appellate review of capital cases, comply with Miss. Code Ann. § 99-19-105 (Supp. 1994).
In reviewing death penalty cases we necessarily must look to Miss. Code Ann. Sections 97-3-21 (Supp. 1993), 99-19-101 (Supp. 1993) and 99-19-105 (Supp. 1994). Therefore, "in construing statutes in pari materia, as we must here, all of the relevant statutes must be taken into consideration, and a determination of legislative intent must be made from the statutes as a whole." Martin v. State, 501 So.2d 1124, 1127 (Miss. 1987); McLamb v. State, 456 So.2d 743 (Miss. 1984). Our lawmakers have mandated that this Court must perform harmless error analysis or reweighing in death penalty cases. Accordingly, when we read the above mentioned statutes together, we reach the conclusion that the jury must make the initial decision to sentence the accused to death. However, on appellate review, if this Court or the United States Supreme Court should determine that one of the aggravators found by the jury was constitutionally infirm, this Court must then reweigh the remaining aggravators and mitigating factors or apply harmless error analysis and determine if the death penalty is warranted in the case then before the court.
Under amended Miss. Code Ann. § 99-19-105 (Supp. 1994), the defendant is not deprived of due process of law. Miss. Code Ann. § 99-19-101 (Supp. 1993) still requires that the jury in capital murder cases must decide to sentence the accused to death. The changes in Miss. Code Ann. § 99-19-105 (Supp. 1994) dictate the scope of our appellate review in capital punishment cases.
The federal district court, in its October 3, 1994 Memorandum Opinion and Order in Dufour, supra, failed to consider relevant Mississippi case law or United States Supreme Court decisions when determining that Mississippi would not retroactively apply Miss. Code Ann. § 99-19-105 (Supp. 1994). This Court has retroactively applied Miss. Code Ann. § 99-19-101 (Supp. 1977) in several death penalty convictions  most recently in Johnston v. State, 618 So.2d 90 (Miss. 1993). In Johnston, the accused committed a *1185 murder in 1976 while the former death-penalty statute was in effect. In 1977 after the accused had committed the murder, the legislature amended § 97-3-21 to comply with the reading given it by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976). At the same time the legislature amended § 97-3-21, it enacted § 99-19-101 (Supp. 1977), which replaced the Jackson guidelines for bifurcation and weighing of aggravating and mitigating circumstances at sentencing. Johnston, 618 So.2d at 95. Johnston was tried in 1989 and sentenced pursuant to the procedural guidelines of § 99-19-101. Id. This Court in a unanimous opinion held that Johnston's conviction did not present an ex post facto problem because the changes represented by § 99-19-101 were "procedural and not ameliorative." Johnston, 618 So.2d at 95, quoting Irving v. Hargett, 518 F. Supp. 1127, 1140 (N.D.Miss. 1981); Jordan v. State, 365 So.2d 1198, 1204 (Miss. 1978); Irving v. State, 361 So.2d 1360, 1368 (Miss. 1978); Bell v. State, 353 So.2d 1141, 1143 (Miss. 1977). See also Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
Likewise, this Court has affirmed the retroactive application of: (1) the habitual offender statute to an individual whose two prior qualifying crimes were committed before Miss. Code Ann. § 99-19-81 (Supp. 1977) was enacted; Smith v. State, 465 So.2d 999, 1003 (Miss. 1985); (2) the commutation of prison time statute which was in effect at the time the prisoner was sent to prison as opposed to the statute that was in effect at time prisoner was sentenced; Post v. Ruth, 354 So.2d 1111, 1112 (Miss. 1978); and (3) the Uniform Narcotics Drug Act, which provided for more severe punishment for a third drug related offense, even though the defendant's first two convictions occurred prior to the enactment of the Act; Branning v. State, 224 So.2d 579 (Miss. 1969). In each of the previous cases we held that the defendant had not been subjected to an ex post facto law in violation of U.S. Const. Art. I, § 10.
It is further noted that the federal district court failed to take notice of the United States Supreme Court's decision in Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Collins affirmatively holds that this Court can apply Miss. Code Ann. § 99-19-105 (Supp. 1994) retroactively.
In Collins, the respondent was convicted in a Texas trial court of aggravated sexual abuse. Collins, 497 U.S. at 39, 110 S.Ct. at 2717, 111 L.Ed.2d at 37. The jury imposed a sentence of life imprisonment and a fine of $10,000. After the respondent's conviction was affirmed by the Texas Court of Criminal Appeals, Youngblood applied for a writ of habeas corpus in the State District Court. Id. Youngblood argued that the Texas Code of Criminal Procedure did not authorize a fine in addition to a jail term for his offense. Id. Youngblood argued further that Bogany v. State, 661 S.W.2d 957 (1983), dictated that his judgment and sentence be invalidated and that he be granted a new trial. Collins, 497 U.S. at 39, 110 S.Ct. at 2717, 111 L.Ed.2d at 37.
Before the habeas petition was considered by the Texas Court of Criminal Appeals, a new Texas statute designed to modify Bogany became effective. The new statute allowed the Texas appellate courts to reform an improper verdict that assessed a punishment not authorized by law. The Texas Court of Criminal Appeals, relying on the new statute, reformed Youngblood's sentence by ordering the deletion of the $10,000 fine and denied his request for a new trial. Id.
Youngblood sought a writ of habeas corpus in the United States District Court for Eastern District of Texas. The federal district court denied his writ and he appealed to the United States Fifth Circuit. Id. The Fifth Circuit reversed the district court and granted Youngblood's writ. Youngblood v. Lynaugh, 882 F.2d 956 (5th Cir.1989). The Fifth Circuit held that Youngblood's right to new trial under the Bogany decision could not be abridged by the retroactive application of the new Texas statute.
The United States Supreme Court in Collins enunciated its understanding of what might constitute a "procedural" change for purpose of the Ex Post Facto clause. The Court opined:
Several of our cases have described as "procedural" those changes which, even though they work to the disadvantage of the accused, do not violate the Ex Post *1186 Facto Clause. Dobbert v. Florida, supra, [432 U.S. 282,] at 292-293, and n 6, [97 S.Ct. 2290, at 2297-2298 and n. 6]. While these cases do not explicitly define what they mean by the word "procedural," it is logical to think that the term refers to changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes. Respondent correctly notes, however, that we have said that procedural change may constitute an ex post facto violation if it "affect[s] matters of substance" by depriving a defendant of "substantial protections with which the existing law surrounds the person accused of crime" or arbitrarily infringing upon "substantial personal rights."
Collins, 497 U.S. at 45, 110 S.Ct. at 2721, 111 L.Ed.2d at 40. (citations omitted) (emphasis added).
The United States Supreme Court reversed the Fifth Circuit and held that the retroactive application of the Texas statute that allowed Texas appellate courts to reform improper sentences was not violative of the Ex Post Facto Clause of Art I, § 10 of the United States Constitution. The Texas statute allowing reformation of improper jury sentences did not punish as a crime an act previously committed, which was innocent when committed; nor make more burdensome the punishment for a crime after its commission; nor deprive one charged with a crime of any defense available according to law at the time when the act was committed. Collins, 497 U.S. at 52, 110 S.Ct. at 2719, 111 L.Ed.2d at 45.
The revised Miss. Code Ann. § 99-19-105 does not punish as a crime an act previously committed, which was innocent when committed; nor does it make the punishment for capital murder more burdensome; nor does the statute deprive the accused of any defense available to him. Therefore, the amended Miss. Code Ann. § 99-19-105 does not violate the Ex Post Facto Clause of Art. I, § 10 of the United States Constitution or the Mississippi Constitution.
Finally, I would suggest that Miss. Code Ann. § 99-19-105 (Supp. 1994) as amended is not violative of the defendant's due process rights. Nor is the statute invalid under the Ex Post Facto Clause of the United States Constitution or the Mississippi Constitution. Miss. Code Ann. § 99-19-105 (Supp. 1994) does not deprive the defendant of "substantial protections with which the existing law surrounds the person accused of [a] crime." Collins, 497 U.S. at 45, 110 S.Ct. at 2721, 111 L.Ed.2d at 40. In fact, Miss. Code Ann. § 99-19-105 (Supp. 1994) changes the procedural aspects under which a capital murder case is adjudicated on appellate review as opposed to changing the substantive law of capital murder. Id. Therefore, this Court should apply Miss. Code Ann. § 99-19-105 (Supp. 1994) to all defendants convicted of capital murder and sentenced to death whose appeals are before this Court. Accordingly, I respectfully dissent.
SMITH, J., joins this opinion.
SMITH, Justice, concurring in part and dissenting in part:
I agree with the majority on all issues other than Issue IV. I prefer the reasoning of my dissents in Wilcher v. State, 635 So.2d 789 (Miss. 1993) and Hill v. State, No. 93-DP-00392-SCT, ___ So.2d ___ [1994 WL 707262], On Petition for Rehearing, (not yet reported), and therefore, consistent with my aforesaid opinions, I adopt said opinions as my view in the case sub judice.
JAMES L. ROBERTS, Jr., J., joins this opinion.
NOTES
[1] The federal district court in Dufour v. Hargett, No. 3:87cv74GR (S.D.Miss. Oct. 3, 1994), opined that the right to jury sentencing was a vested right under Mississippi law and that Dufour's right to due process would be violated by the retroactive application of the amendments in question. We need not reach the constitutional issue here because we construe the statutory changes as applicable prospectively.
[1] Interestingly, the majority states that the right of the defendant to be sentenced to death by a jury is a "substantial substantive right long held in this state." King, at 1174. However, it would appear that this "substantial substantive right" has existed since approximately 1977. Before the 1977 change in the capital murder statute, the penalty for capital murder was an automatic death sentence unless the jury voted to spare the defendant's life.